```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       OCALA DIVISION

 3   UNITED STATES OF AMERICA,        Ocala, Florida

 4           Plaintiff,               Case No. 5:21-mj-1009-PRL

 5   -vs-                             January 19, 2021

 6   MICHAEL CURZIO,                  4:38 p.m.

 7           Defendant.               Courtroom 1A
     _____

 8

 9      DIGITALLY RECORDED INITIAL APPEARANCE (RULE 5c) AND BOND
                       HEARING (VIA ZOOM)
10             BEFORE THE HONORABLE PHILIP R. LAMMENS
                 UNITED STATES MAGISTRATE JUDGE
11

12                   A P P E A R A N C E S

13
     GOVERNMENT COUNSEL:
14
             William Hamilton, Esquire
15           U.S. Attorney's Office
             35 Southeast 1st Avenue, Suite 300
16           Ocala, FL  34471

17
     DEFENSE COUNSEL:
18
             Christine Bird, Esquire
19           Federal Defender's Office - Ocala
             201 Southwest 2nd Street, Suite 102
20           Ocala, FL  34471

21
     OFFICIAL COURT REPORTER:
22
             Shelli Kozachenko, RPR, CRR, CRC
23           221 North Hogan Street, #185
             Jacksonville, FL  32202
24           Telephone:  (904) 301-6842

25             (Proceedings recorded by electronic sound recording;
                    transcript produced by computer.)
```

P R O C E E D I N G S

January 19, 2021                                    4:38 p.m.

- - -

1       THE COURT:  All right.  Good afternoon.

2       This is Case No. 5:21-mj-1009, United States versus
Michael Curzio.

3       Mr. Hamilton represents the United States.
Mr. Curzio is represented by Ms. Bird, our assistant federal
public defender.

4       Since last week, Mr. Curzio, the District of Columbia
has filed a new charging document against you.  It's called an
information.  It now includes four distinct counts or four
distinct charges.

5       I'm going to ask the government to go over the
charges against you and the possible penalties for each of
them.

6       Mr. Hamilton, if you'll do that one at a time.

7       MR. HAMILTON:  Yes, Your Honor.

8       So, Your Honor, the -- one moment.  I'm sorry.  I'm
experiencing some small technical difficulties.

9       So, Your Honor, the information charges Mr. Curzio
with four separate counts.

10      Count One charges that on or about January 6th of
this year, in the District of Columbia, he, together with five
others, knowingly entered and remained in the U.S. Capitol

1    without lawful authority to do so.  This is in violation of

2    Title 18, U.S. Code, Section 1752(a)(1).

3            Count Two charges, on the same date and place, that

4    he knowingly, and with intent to impede and disrupt the orderly

5    conduct of government business, engaged in disorderly and

6    disruptive conduct and within such proximity to the Capitol so

7    that such conduct did, in fact, impede and disrupt the conduct

8    of government business.  This is in violation of Title 18, U.S.

9    Code, Section 1752(a)(2).  That's Count Two.

10           Count Three charges that on or about January 6th of

11   this year, in Washington, D.C., that he, together with five

12   others, willfully and knowingly engaged in disorderly and

13   disruptive conduct within any of the Capitol buildings with the

14   intent to impede, disrupt, or disturb the conduct of a session

15   of Congress or either house of Congress.  This is in violation

16   of Title 40, U.S. Code, Section 5104(e)(2)(A).

17           Count Four charges again that on January 6th of this

18   year, in the District of Columbia, he, together with five

19   others, willfully and knowingly paraded, demonstrated, and

20   picketed within a Capitol Building.  This is in violation of

21   Title 40, U.S. Code, 5104(e)(2)(G).

22           As to maximum penalties, Your Honor, Counts One and

23   Two have the same maximum penalties, and those penalties -- and

24   this is the penalty for both Count One and Count Two.  It's up

25   to one year of incarceration per count, a fine of up to

1  $100,000 per count, a term of supervised release of up to one

2  year, again, per count, and then a $25 special assessment per

3  count.

4        Now, Counts Three and Four also have the same maximum

5  penalties.  And those penalties are 180 days of incarceration

6  per count, a fine of no more than $5,000 per count, a term of

7  supervised release of up to one year per count, and, again, a

8  $10 mandatory special assessment per count.

9        THE COURT:  Thank you, Mr. Hamilton.

10       MR. HAMILTON:  Thank you, Your Honor.

11       THE COURT:  Mr. Curzio, do you understand the charges

12  in each of the four counts?

13       THE DEFENDANT:  Yes, sir.

14       THE COURT:  And the potential penalties, the maximum

15  term of imprisonment of one year on Counts One and Two and six

16  months on Counts Three and Four, as well as the fines and

17  special assessments and supervision that the prosecutor

18  mentioned?

19       THE DEFENDANT:  Yes, sir.

20       THE COURT:  All right.  The case was set for a bond

21  hearing.  The case is pending in the District of Columbia, as

22  I've mentioned before.  That case number is 21-mj-12.

23       You can request your bond hearing be conducted here

24  or in the District of Columbia.  You should know that the

25  outcome of the hearing here could be overruled by the District

1  of Columbia, and if you got a bond hearing here, you couldn't

2  then ask for a separate one before a magistrate judge in the

3  District of Columbia.  So in a sense you get one bite at the

4  apple.

5          Ms. Bird, are you prepared to go forward?  I think

6  the government was seeking detention.

7          MS. BIRD:  Yes, Your Honor.

8          THE COURT:  Mr. Hamilton, do you want to proceed,

9  then?

10          MR. HAMILTON:  I will.  I need to share with the

11  Court a -- some updated information I received about the

12  standard for detention in this case.

13          As you know, it's not -- it's relatively uncommon for

14  us to have misdemeanor charges before the Court.  I had

15  previously stated that we would be proceeding primarily based

16  on risk of harm to the community.

17          I have since learned that Mr. Curzio -- due to the

18  nature of the charges as misdemeanors that are not considered

19  crimes of violence under the categorical approach, he is

20  eligible for detention only upon a showing that he is a flight

21  risk.

22          So that would be -- so just to clarify that, with

23  leave of the Court, I would like to proceed by proffer at this

24  point.

25          Your Honor, I -- I'll start by going through the

1   statutory factors for detention.  I'd like to start with the

2   nature and circumstances of the offense.

3          The defendant is currently charged with four

4   misdemeanor offenses with a maximum penalty of -- would be a

5   total of three-and-a-half years in prison, about four years of

6   supervised release.

7          But the circumstances of the offense are much broader

8   than the charges on the information indicate.

9          THE COURT:  I mean --

10          MR. HAMILTON:  Yes?

11          THE COURT:  I don't mean to interrupt, but it would

12   be one year on Count One.  The Court could then sentence him to

13   an additional year on Count Two.

14          MR. HAMILTON:  Yes, sir.

15          THE COURT:  And then six months on Count Three and

16   six months on Count Four?

17          MR. HAMILTON:  Yes, Your Honor.  That's correct.  It

18   would be three years, not three-and-a-half.  I misspoke.  Thank

19   you, sir.

20          THE COURT:  Yeah.  But he could get up -- he could

21   get sentenced to three full years.  I mean, it could end up

22   being three full years.

23          MR. HAMILTON:  Yes.  If the sentencing court decided

24   to impose all of the sentences consecutively, that would be the

25   maximum, yes, sir.

1          THE COURT:  Okay.

2          MR. HAMILTON:  As the Court and, I think, most

3    members of the American public are aware, on January 6th you

4    had a joint session of Congress presided over by the Vice

5    President of the United States.  They had to be suspended, and

6    congressional chambers had to be evacuated hurriedly.

7          Based on publicly available information, no fewer

8    than five people lost their lives during the riot that

9    transpired immediately afterward, including a D.C. Capitol

10   Police officer who was apparently bludgeoned to death during

11   the disruption.

12         Congressional offices were broken into.  Potentially

13   sensitive material and equipment was stolen.

14         Based on the significant loss of human life,

15   including the loss of life of a law enforcement officer trying

16   to restore order, severe disruption of critical functions of

17   the federal government at a critical time -- and I think we can

18   fairly say that the circumstances of this crime,

19   notwithstanding the specific charges against Mr. Curzio, are

20   among the most severe in recent U.S. history.

21         Mr. Curzio, as we know from the probable cause

22   affidavit, was part of one of the groups that was inside the

23   Capitol Building, a group that the police saw firsthand and was

24   throwing objects and spraying officers with unknown pollutants.

25   Based on this information, he was an active participant in

1   these events.

2          As to the second factor -- that's the weight of the

3   evidence against the person -- again, as detailed in the

4   probable cause affidavit, the officer directly witnessed Curzio

5   at the forefront of a group that was engaging in violent

6   destructive behavior, having broken into the U.S. Capitol, and

7   apparently battering law enforcement officers through thrown or

8   sprayed projectiles.

9          Law enforcement officers who witnessed the

10  defendant's crime firsthand ordered him to stop, and he then

11  refused.

12         There are dozens if not hundreds of civilian

13  eyewitnesses to this offense, but probably the strongest thing

14  in terms of the weight of the evidence against Mr. Curzio is

15  when he was arrested by the FBI late last week, while he was in

16  custody, he spontaneously stated to the FBI officer that he was

17  present at the D.C. riots, he was inside the Capitol Building,

18  that he knew he was not supposed to be there, and that the

19  police officer told him to leave, and he didn't.

20         Now, he was in custody at the time, but per the FBI

21  agent, these were spontaneous statements, not in response to

22  any questioning.  I expect they'll be admitted in evidence if

23  Mr. Curzio elects to proceed to trial on these offenses, and I

24  expect, entirely just on that basis, he'll be convicted as

25  charged.

1          Notwithstanding firsthand law enforcement witness

2    testimony, I think the weight of the evidence against

3    Mr. Curzio is extremely strong.

4          Now, as for the history and characteristics of the

5    person, I think Mr. Curzio has demonstrated that he does not

6    have much respect for other people's persons or property or the

7    law.  As the Court's aware from the pretrial services report,

8    he was convicted in 2012 or 2013 for attempted first-degree

9    murder with a firearm.  He served an eight-year Florida prison

10   term for that offense.

11         The facts of that offense were that he shot the

12   victim in the chest, resulting in that victim's paralysis.  He

13   did not have any term of supervision to follow.  There wasn't

14   any probation following his release from prison.

15         But at the time of this offense, January 6th, he had

16   been out of prison for his attempted first-degree murder with a

17   firearm conviction for less than two years.  He was released in

18   February of 2019 and was arrested for this January 6th of this

19   year.

20         Now, Mr. Curzio was not idle while he was in Florida

21   State Prison.  As is detailed in the pretrial services report,

22   Mr. Curzio was interviewed September 18th, 2018, by Florida

23   Department of Corrections personnel.  He admitted being a

24   member of a violent white supremacist gang called The

25   Unforgiven that operates in and outside of the prison system.

1   He said he had been a member since at least 2015 and that he

2   joined because he was, quote, like-minded.

3          He also had tattoos associated with that gang that

4   were documented and photographed by the Florida Department of

5   Corrections intelligence division.  That includes swastikas

6   with the symbol of the Nazi Germany SS paramilitary force on

7   the backs of both of his arms.

8          When he was arrested by the FBI, he had a pendant

9   that was described to me as being sort of a Thor's hammer type

10  of pendant that's also associated with white power prison

11  gangs.

12         Per, of course, the updated presentence report

13  [verbatim] that was provided to the Court after the filing of

14  the information, Mr. Curzio is evidently a regular recreational

15  drug user, admitted to using marijuana continuously since -- I

16  believe he admitted to up to December of last year.

17         Most troublingly, though, is pretrial services,

18  despite having at this point five or six days to verify his

19  information, has not been able to make contact with anyone that

20  can verify where he would stay, any of the background

21  information, psychiatric history, or other information, or

22  anyone that could serve as a third-party custodian.

23         Despite repeated attempts to contact relatives,

24  friends, roommates, no one has returned, as I understand it,

25  any of the phone calls from pretrial services.

1          So what I would suggest we have here, Your Honor, is

2    despite these are misdemeanor charges, we have an individual

3    who was present and an active participant in a major, severe

4    crime in which multiple people died and functions of the

5    federal government were significantly impeded, for a time at

6    least.

7          And we have no way really to verify his living

8    situation, what individuals would be available to verify that

9    he's able to make appearances at his future court dates, either

10   here or in Washington, D.C., on these charges.  He's admitted

11   to recreational drug use.  He has a severe criminal history.

12         To me, what that suggests is that he is a significant

13   flight risk, not only because he's facing additional years in

14   prison but because he has a long history, I would argue, of

15   disregarding the law, and that would include the orders of

16   courts.  And I don't think he's a good candidate for pretrial

17   release on that basis.

18         Now, in the alternative, if the Court feels that's an

19   insufficient basis to order Mr. Curzio's detention, I would

20   like to recommend an alternative set of release conditions.

21         And what I would recommend that the Court impose, if

22   you're not inclined to order detention, is I would ask for a

23   signature bond of no less than $40,000, a prohibition from

24   owning any firearms or dangerous weapons -- he should already

25   be subject to these penalties as a convicted felon, but I don't

1   think it would hurt to add it as a condition.

2           I would ask that he be specifically ordered not to go

3   to Washington, D.C., unless he is given notice to go to an

4   in-person court hearing in Washington, D.C.  I would also ask

5   that his travel be restricted, that he not be permitted to

6   travel outside the Middle District of Florida without the prior

7   approval of pretrial supervision.

8           Per pretrial's recommendation, I would ask that he be

9   subject to home detention, including GPS monitoring if the

10  Court feels that's appropriate.  I echo their concerns on that

11  front, and I think that's a good recommendation.  I would also

12  recommend that a curfew be imposed from 9:00 p.m. to 6:00 a.m.

13  as part of that home detention.

14          I would ask that all travel documents be surrendered.

15  It appears from the pretrial services report that he indicated

16  he has no passport.  I would request that the Court order that

17  he surrender any passport he may have and be prohibited from

18  applying for any new travel documents or passports.

19          Your Honor, those would be the conditions I would

20  recommend in lieu of detention, if that's what the Court is

21  inclined to impose, but what I am asking for, on the basis of

22  flight risk, is that he be detained pending resolution of this

23  case.

24          THE COURT:  Just give me one minute, okay, Ms. Bird?

25          MS. BIRD:  Yes, sir.

1          THE COURT:  What makes you think danger to the

2    community isn't a basis for detention, given the court's broad

3    application of the Bail Reform Act in *U.S. versus Megahed*?

4          THE DEFENDANT:  Your Honor, can I have a minute with

5    Ms. Bird?

6          THE COURT:  Sure.

7          THE DEFENDANT:  Thank you.

8          COURTROOM DEPUTY:  One moment.

9       (Pause in proceedings.)

10          THE DEFENDANT:  I see the judge.

11          COURTROOM DEPUTY:  You want to try it again?

12          THE DEFENDANT:  Pardon?

13          COURTROOM DEPUTY:  You left and then you came back.

14          Do you need me to resend it?

15          THE DEFENDANT:  Yes, please.

16          COURTROOM DEPUTY:  Chris is in there so I've got to

17   get her out.

18          THE DEFENDANT:  Yes, ma'am.

19          Sorry, Chris.  My bad.

20          MS. BIRD:  Are we back?

21          THE DEFENDANT:  No, ma'am.  I --

22          COURTROOM DEPUTY:  I had to redo it for the jail.

23          Can you try again, please.

24       (Pause in proceedings.)

25          COURTROOM DEPUTY:  All right.  Ms. Bird?

1        MS. BIRD:  I'm back.

2        THE COURT:  All right.  You all set?

3        MS. BIRD:  Yes.

4        COURTROOM DEPUTY:  Okay.  Just one moment.

5     (Pause in proceedings.)

6        THE COURT:  I asked, Mr. Hamilton, because the Court

7  has held in *Megahed* that while the Bail Reform Act lists

8  certain offenses under which a court shall have a hearing, that

9  that doesn't preclude it from having a hearing in other types

10  of cases.

11        The court, in *Megahed*, said, for example, "The court

12  generally needs no authority or specific grant in order to hold

13  a hearing.  No reason exists to believe that Congress conceived

14  the requirement of a hearing in one circumstance to

15  simultaneously and silently forbid a hearing in any other

16  circumstance."

17        The court held that it cannot concur in any

18  interpretation that says otherwise which would "torture words

19  forbidding release without a hearing in certain cases if the

20  government seeks a hearing into words that forbid detention in

21  any other case involving any other charge and every other

22  offender despite imminent danger to the public."

23        MR. HAMILTON:  *Megahed* is an Eleventh Circuit

24  decision, correct, Your Honor?

25        THE COURT:  No.  It's a district court opinion from

1   2007.

2            MR. HAMILTON:  Yes, sir.

3            THE COURT:  And there's a -- albeit another district

4   court opinion written by a magistrate judge out of the Western

5   District of Virginia applying *Megahed* to Class B misdemeanors,

6   which two of these charges are, and saying, "While some

7   circuits disagree" -- not the Eleventh.  I don't know if the

8   Eleventh speaks to it.

9            But, "While some circuits disagree, the Court takes

10  the broad reading of *Megahed* to mean that the Court can conduct

11  a bond hearing and consider both risk of flight and danger to

12  the community in a Class B misdemeanor."  I would submit you

13  could do so then also in a Class A misdemeanor, which two of

14  these charges are.

15           And Title 18 of the United States Code, Section 3156,

16  which defines the terms in the Bail Reform Act, doesn't limit

17  the term "offense" to only felony offenses.  The term "offense"

18  means any criminal offense, other than a court-martial or

19  military commission, which we're not dealing with, which is in

20  violation of an act of Congress and is triable in any court

21  established by act of Congress.

22           So there -- we're dealing with acts of Congress in a

23  court created by Congress.

24           In any event, I don't know that your argument would

25  differ, but I just mention that for Ms. Bird's benefit.  I'm

1  not sure that danger to the community is not a factor the Court

2  would consider.

3          MR. HAMILTON:  I understand.

4          My understanding, from the guidance I received, was

5  that it couldn't be the sole basis for the Court to order his

6  detention.  I think there has to be at least a threshold --

7  threshold showing of a flight risk.  But that was -- that was

8  my understanding.

9          In light of the *Megahed* decision and the Court's

10  explanation, I stand corrected.

11          THE COURT:  Unless the circuit court says otherwise.

12          But, Ms. Bird?

13          MS. BIRD:  Yes, Your Honor.

14          I think that on both prongs, the government has not

15  met its burden in this case.  I can tell you, with regard to

16  the risk of flight, I think basically the government almost

17  conceded at the last hearing that it didn't think it would be

18  able to make that prong, although it did revise its opinion on

19  that today.

20          Clearly my client has significant ties to this area,

21  which is why we were requesting the detention hearing in this

22  area.

23          He's been in Summerfield, Florida, since 2008.  He

24  works in that area.  He has cousins, a roommate, family in the

25  Summerfield area.  He lives on the property that is adjacent to

1  his father's.  It's like the same property but a different home

2  where they live together, so he has significant family ties.

3  He has no contacts with any other -- you know, extensive

4  contacts with any other jurisdiction.

5        Although the government has indicated that pretrial

6  services has made repeated attempts to contact the father, I

7  can tell you that his family has been busy trying to assist him

8  in hiring an attorney and have met and sat down with an

9  attorney in the attorney's office.  So they clearly are trying

10 to assist him in any manner that they can.  He also has contact

11 with his sister on a regular basis.

12        He has a valid license that reflects the same

13 address, date of birth, Social Security number as reported to

14 pretrial services.

15        He's also employed.  He works in the area.  Actually

16 when he was picked up, he was driving from his job on Route 42

17 on his way back to his home.

18        And he's a handyman.  He makes about $1,700 a month.

19 He's able to take care of himself.  He's also worked in

20 trucking as a truck driver and in construction and waste

21 management.

22        And, significantly, he has a license through the

23 Department of Transportation that requires a physical.  It's a

24 Class B license, and he's scheduled to take that physical later

25 on this week, so he has goals that he needs to achieve if he is

1    released on pretrial release.

2           He has some assets, and significantly, I will -- I'll

3    tell the Court that there's really no evidence that he's not

4    going to appear in this case.

5           They gave him a notice to appear, actually, when he

6    was in the District of Columbia, to appear on a date in June of

7    2021 and then later on decided to do a more custodial arrest.

8           Nothing in his health or his substance abuse history

9    would suggest that he would fail to appear.  He had, I think,

10   ADHD when he was a child.  He has no history of any psychotic

11   behavior, no history of visual or auditory hallucinations.

12          He has one prior incident back in 2003 -- that is 17

13   years ago -- where he was released within 24 hours.  And, of

14   course, the Court could address any concern on that matter

15   (unintelligible) with conditions.

16          Although he does admit that he consumes alcohol, he

17   consumes alcohol once -- once a week maybe in (unintelligible)

18   settings.  And although he had smoked marijuana on a regular

19   basis, that is something that could be addressed because he's

20   willing to participate in substance abuse treatment if he was

21   released on bond.

22          There's really nothing that -- in your standard

23   reflection on this case -- these are misdemeanor offenses.  The

24   maximum possible penalty that he receives would be three years,

25   followed by supervised release.

1        But, of course, now, he could receive much less of a

2   sentence.  There would probably be some sort of negotiations

3   (unintelligible), and then the guidelines should give him some

4   relief from that maximum penalty.

5        With respect to his criminal history, the government

6   went on saying that he had a long criminal history.  The truth

7   of the matter is he has a traffic citation from January 31st,

8   2005.  He has another traffic citation from July 28th, 2006,

9   and then he has this arrest here.

10        He has one prior felony, an attempted first-degree

11   murder that happened in 2012, for which he did eight years in

12   prison and was released.  And since his release, he's been

13   trying to get his life back together by working, keeping his

14   license, and doing all those other matters.

15        He does not have an extensive, lengthy history.  He

16   has no history that the government could point to

17   (unintelligible) where he failed to appear for court or that he

18   violated any kind of probation.

19        It looks here, with these traffic (unintelligible)

20   that he had, that he was able to complete those conditions and

21   was able to do what he needed to do to get his license back.

22        The government also mentions -- although I -- and I

23   suppose, if we're talking about danger to the community, he has

24   connections with The Unforgiven and talked about his verifying

25   that he became part of The Unforgiven while he was in the

1    Bureau of Prisons [verbatim].

2           However, there's no real -- I mean, what you're not

3    hearing is that there's any disciplinary referral or any action

4    that he took for any violence or any failure to obey commands

5    while he was in prison.  Simply the matter is that he's a

6    member of this gang, who many people would find offensive,

7    Unforgiven.

8           But there's nothing connected with that suggesting

9    that that -- that this incident's related to Unforgiven or

10   that -- that he took any action that was dangerous based on his

11   affiliation with this.

12          I'm not an expert on prisons and how things work in

13   prison, but I do know people get affiliated because there's

14   dangers in prison that they face, and sometimes that's the

15   reason that they're affiliated.  And perhaps he was

16   like-minded, and while you might not like that, that's not a

17   reason to find that he's a danger.

18          Now, we haven't even heard that Unforgiven, the gang

19   itself, has created any (unintelligible), other than having

20   offensive attitudes to minorities and different -- people of

21   different backgrounds.

22          Although he does have that one offense, he does not

23   have an extensive history of criminal conduct.  He has a family

24   that's supportive, trying to hire him an attorney.

25          He would dispute the facts, as set forth by the

1   government, that he took place in any -- took part in any

2   violent action while he was at the Capitol.  I'm not sure where

3   the government got that evidence.

4          He indicated he was not violent, although he did

5   admit and apparently was cooperative with law enforcement when

6   they asked him -- or when he was arrested, I should say, near

7   his home on (unintelligible) for the warrant on the misdemeanor

8   offenses.

9          I don't think that my client would object to the

10  additional conditions that the government proposed if the

11  Court's inclined to release my client, but I don't see that the

12  government has shown that he's a risk of flight and also -- or

13  a danger to the community.  And certainly here -- you know,

14  not locally.

15         The Court can restrict his travel if the Court's

16  worried about additional protests and additional rioting or

17  anything like that.  You know, all those conditions would be

18  fine, but it doesn't seem to me that the government's met its

19  burden in this case.

20         THE COURT:  Mr. Hamilton?

21         MR. HAMILTON:  Just by way of rebuttal, Your Honor, I

22  would say I'm not really in a position to give a detailed

23  presentation on the scope of criminal activity of the

24  particular white supremacist gang in question.

25         But my understanding is they are significant in scope

1    and have been associated with a wide variety of criminal

2    activity, both violent and drug related, and are not simply a

3    club that expresses white supremacist opinions.  They are a

4    fully fledged criminal gang in the Florida prison system and

5    outside of it.

6            So I -- I'm not in a position to make a detailed

7    presentation on their activities or anything like that today,

8    and I don't think that -- I don't think that's something that

9    would normally be seen at a detention hearing.

10           What I can tell you is they have a well-established

11   reputation for violence and illegal activity and that

12   Mr. Curzio, in September of 2018, freely admitted his

13   involvement with them and that he was of a like mind with them.

14           Otherwise, I'll stand on my prior arguments.

15           THE DEFENDANT:  Can I speak with Ms. Bird again,

16   please, Your Honor?

17           THE COURT:  You may.

18           THE DEFENDANT:  Thank you.

19       (Pause in proceedings.)

20           COURTROOM DEPUTY:  All right.  Ms. Bird, you all set?

21           MS. BIRD:  Yes.

22           COURTROOM DEPUTY:  All right.  Just one moment.

23           Mr. Hamilton?

24           Oh, you're muted.

25           MR. HAMILTON:  I'm ready.

1          COURTROOM DEPUTY:  Thank you.

2          THE COURT:  Ms. Bird, anything further before I

3     proceed?

4          MS. BIRD:  Yes, Your Honor.

5          My client just wanted to speak to the gang

6     affiliation.  And what he did is he -- he reiterated to me

7     that -- that when he made those admissions regarding a gang

8     affiliation, he also told that officer that he was affiliated

9     because of the situation he found himself in.  He was tired of

10    being beaten up and tired of being -- you know, having a hard

11    time being abused in prison.

12         And that what he -- you know, once he was released

13    from prison, he is not associated with the gang.  He is not a

14    gang member.  He says, in fact, it had really nothing to do

15    with being like-minded, that he actually has family members

16    that are interracial, you know, half black, that he loves and

17    cherishes his black friends.  He said it was a situational

18    thing, and -- and he wanted the Court to be aware of that.

19         And I would just point out again that I don't know

20    anything about Unforgiven, but I would just say that there's

21    nothing on his record, no DRs, nothing to indicate that my

22    client acted in a violent manner as a result of his affiliation

23    (unintelligible) when he was in the (unintelligible).

24         THE COURT:  All right.  Thank you, Ms. Bird.

25         Just give me a minute or two, okay?

1          MS. BIRD:  Okay.

2      (Pause in proceedings.)

3          THE COURT:  In determining whether a bond would

4  issue, the Court starts with the standards.

5          The government, if it seeks your detention, as it

6  has, must show by a preponderance of the evidence -- that's not

7  an overwhelming amount of evidence -- that you are a risk of

8  flight or a danger of nonappearance at future proceedings, or

9  by clear and convincing evidence -- a higher standard than a

10 preponderance of the evidence but not as high as proof beyond a

11 reasonable doubt -- so by clear and convincing evidence that

12 you're a danger to the community.

13         In making that determination, the Court considers

14 various factors.  The nature and circumstances of the offense

15 charged and the weight of the evidence are two of the most

16 important factors.  Ties to the community and employment and

17 criminal history are other important factors.

18         The nature and circumstances of the offense charged

19 are significant.  While Counts One and Two are Class A

20 misdemeanors and Counts Three and Four are Class B

21 misdemeanors, the charges don't exist in a vacuum.

22         This isn't a case charged where, for example, it's

23 alleged that an individual went into an empty government

24 building or explored a restricted area in a reckless way.

25         The conduct here has a setting.  The setting, as the

1    government reminds us and as we all know, is that the Vice

2    President, meeting with the House of Representatives and the

3    United States Senate, were in session conducting the business

4    of the United States when individuals, including, as alleged in

5    the information, Mr. Curzio and others, entered the United

6    States Capitol; as charged, entered and remained in a

7    restricted area; and, as charged, did so while engaging in

8    disorderly and disruptive conduct and, according to the

9    affidavit, refused to leave when directed to.

10          He didn't just happen to be in the area or just

11   didn't happen to be in Washington, D.C.  He had to travel from

12   Florida, and he had to travel over 800 miles to get to D.C. to

13   engage in the conduct that's alleged in the information.

14          Moreover, he had to do so after being released from

15   prison less than two years earlier on truly significant

16   charges.

17          The conduct alleged isn't just about breaking the

18   law.  The conduct alleged has to do with challenging the very

19   existence and establishment of the law.

20          For whatever reason, pretrial services wasn't able to

21   corroborate the defendant's family ties, though the Court takes

22   those to be true, that he does have family here.

23          Counsel says he's been living in the area since 2008,

24   which may be right, but from 2012 until 2019 he was in custody.

25          In terms of danger, it's also noted that in addition

1   to that significant criminal history -- and not in terms of

2   numbers of convictions; I don't think that's what the

3   government meant, but in terms of the seriousness of the prior

4   conviction.  I've seen many cases with multiple prior

5   convictions, but we all could acknowledge that we don't often

6   see prior convictions for attempted murder.

7         While in custody, it's undisputed that he became a

8   member of a gang that's referred to as a white supremacist

9   gang.  That doesn't seem to be in dispute.  Perhaps he's no

10  longer a member.

11         The weight of the evidence is also compelling.  Not

12  only do you have the affidavit of the Capitol Police officer,

13  but you have the proffer that the defendant admitted to his

14  participation, his involvement, to knowingly being there,

15  entering the Capitol, and remaining despite being directed to

16  leave.

17         He does face three years in prison, not an

18  insignificant amount of time to spend in prison by any means.

19         For all of those reasons, I do find that the

20  government has met its burden to show that there is clear and

21  convincing evidence that the defendant poses a risk to the

22  safety of the community and that there is a preponderance of

23  the evidence that there is a serious risk of nonappearance.

24         The defendant will be remanded to the custody of the

25  marshals, transported to the District of Columbia, where the

1    charges are pending and where he'll have an opportunity to

2    proceed there.

3              Anything else for the defense?

4              MS. BIRD:  No, Your Honor.

5              THE COURT:  Mr. Hamilton, for the United States?

6              MR. HAMILTON:  No, Your Honor, nothing further.

7              THE COURT:  All right.  We'll be in recess, then.

8              COURT SECURITY OFFICER:  All rise.

9         (The proceedings were concluded at 4:46 p.m.)

10                             -  -  -

```
1                  CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4    UNITED STATES DISTRICT COURT )

5    MIDDLE DISTRICT OF FLORIDA    )

6

7              I, court approved transcriber, certify that the

8    foregoing is a correct transcript from the official electronic

9    sound recording of the proceedings in the above-entitled

10   matter.

11

12             DATED this 25th day of February, 2021.

13

14                                 s/Shelli Kozachenko_____
                                   Shelli Kozachenko, RPR, CRR, CRC
15                                 Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```